# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| TABITHA PHIPPS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 2:15-cv-02101-STA-cgc |
| | ) | |
| ACCREDO HEALTH GROUP, INC.; | ) | |
| EXPRESS SCRIPTS ADMIN., LLC a/k/a | ) | |
| EXPRESS SCRIPTS, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY

Before the Court are Defendant Express Scripts Administrator, LLC and Defendant Accredo Health Group, Inc.'s separate Motions for Summary Judgment (ECF No. 60, 62), both filed on March 31, 2016. Plaintiff Tabitha Phipps has responded in opposition to each Motion, and each Defendant has filed a separate reply. The parties have therefore completed their briefing on the Motions, and the Motions are ripe for determination. For the reasons set forth below, the Motions are **GRANTED in part, DENIED in part**.

## BACKGROUND

Plaintiff's Amended Complaint (ECF No. 28) alleges claims against Defendants for violations of the Family Medical Leave Act ("FMLA"), the Fair Labor Standards Act ("FLSA"), the Americans with Disabilities Act ("ADA"), the Tennessee Disabilities Act ("TDA"), the Tennessee Public Protection Act ("TPPA"), and Tennessee common law, all arising out of Plaintiff's former employment with Defendant Accredo Health Group, Inc. Defendants now

seek judgment as a matter of law on all Plaintiffs' claims for relief. Pursuant to Local Rule 56.1(a), Defendants have prepared separate statements of facts "to assist the Court in ascertaining whether there are any material facts in dispute."[1] A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law."[2] A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[3] For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact.[4]

As the non-moving party, Plaintiff must respond to Defendants' statements of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed."[5] Additionally, Plaintiff may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[6] Where Plaintiff asserts that a genuine dispute of material fact exists, Plaintiff must support her contention with a "specific citation to the record."[7] If Plaintiff fails to demonstrate that a fact is disputed or simply

---

[1] Local R. 56.1(a).

[2] *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

[3] *Anderson*, 477 U.S. at 248.

[4] Fed. R. Civ. P. 56(c)(1).

[5] Local R. 56.1(b).

[6] Fed. R. Civ. P. 56(c)(2).

fails to address Defendants' statement of fact properly, the Court will "consider the fact undisputed for purposes" of ruling on the Motions.[8]  Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record."[9]

The Court finds that for purposes of Defendants' Motions for Summary Judgment there is no genuine dispute as to the following material facts, unless otherwise noted.  On August 14, 2006, Plaintiff was hired by Accredo Health Group, Inc. ("Accredo") as a customer service representative.  (Def. Accredo's Statement of Undisputed Fact ¶ 1.)  Plaintiff moved to an administrative support position sometime in July 2010.  (*Id.*)  On February 13, 2011, Plaintiff was transferred to a new position as a Work at Home coordinator.  (*Id.*)  During her tenure as a Word at Home coordinator, Plaintiff was supervised by administrative supervisor Pamela Chesser from February 2011 to early September 2013.  (*Id.* ¶ 2.)  Chesser reported to Accredo's manager of operations, Anita Harris.  (*Id.*)

Plaintiff was one of four Work at Home coordinators.  (*Id.* ¶ 2.)  Each Work at Home coordinator was responsible for providing support to Work at Home employees such as pharmacists, nurses, customer service representatives, and patient care representatives.  (*Id.* ¶ 4.)  Work at Home coordinators like Plaintiff conducted home visits and office set-up for Work at Home employees, performed audits, assisted with simple computer issues, and documented downtime.  (*Id.*)  Work at Home coordinators actually worked in an office during normal

---

[7] Local R. 56.1(b).

[8] Fed. R. Civ. P. 56(e)(2); *see also* Local R. 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment.").

[9] Fed. R. Civ. P. 56(c)(3).

business hours and used a timekeeping system called Kronos to record their work hours with a badge swipe or keyed entry of an identification number.  (*Id.* ¶ 5.)

Prior to September 2013, Plaintiff and Work at Home coordinators like her were required to be available outside of normal business hours and over the weekend on a rotating basis.  (*Id.*)  After business hours and during their on-call weekends, Work at Home coordinators were expected to use a company-issued cell phone to answer calls from Work at Home employees and assist the employees as needed.  (*Id.* ¶ 6.)  Work at Home Coordinators received a flat rate for each hour of work they performed outside of normal business hours, regardless of how long the call actually lasted.  (*Id.* ¶ 7.)  For example, if a Work at Home coordinator took a call at 7:25 p.m. and the call lasted only one minute, the Work at Home coordinator would receive one full hour of on-call pay.  (*Id.*)  Likewise, if a Work at Home coordinator took multiple short calls between 7:00 p.m. and 7:59 p.m. the Work at Home coordinator would receive one hour of on-call pay.  (*Id.*) And if a Work at Home coordinator took one short call at 8:00 p.m. and a second short call at 9:00, the Work at Home coordinator received two hours of on-call pay.  (*Id.*)

Plaintiff adds that Accredo also expected Work at Home coordinators to answer their company cell phone during regular business hours, regardless of whether the Work at Home coordinator was off the clock or on a break.  (Pl.'s Resp. to Accredo's Statement of Fact ¶ 5.)  Accredo also expected Work at Home coordinators to answer after-hours calls to their company cell phones even if it was not the Work at Home coordinator's regular on-call rotation.  (*Id.*)  Plaintiff testified in her deposition that Work at Home coordinators could also use their personal cell phones and home landlines to answer calls from or return calls to Work at Home employees.  (*Id.* ¶ 6.)

Work at Home coordinators reported their on-call time to Chesser by sending her an email detailing the time, and Chesser would send the information on to payroll. (Def. Accredo's Statement of Undisputed Fact ¶ 8.) Each email had to include the name of the Work at Home employee, the employee's phone number, and the date and time of the call. (*Id.*) Plaintiff recorded her on-call time either at the time she received a call from a Work at Home employee or whenever she could see a clock. (*Id.* ¶ 9.) Plaintiff used a piece of paper to write down the information and then typed up the details in a log she periodically emailed to Chesser. (*Id.*)

On or about August 28, 2013, Plaintiff asked Chesser about her pay for 20 hours of on-call time. (*Id.* ¶ 10.) Chesser reviewed Plaintiff's email with the time log for the hours in question and checked the time Plaintiff submitted against the time for which Plaintiff was paid. (*Id.*) Chesser found that Plaintiff had received pay for all of the time she had reported. (*Id.*) Chesser advised Plaintiff that if Plaintiff believed she had not been paid for all of her time, she should report any missing time in another email. (*Id.*) Plaintiff did so, and when Chesser received the email, she noticed what she believed to be discrepancies. (*Id.* ¶ 11.) Specifically, an email from Plaintiff dated August 22, 2013, referred to hours worked on August 23 and 24, 2013. (*Id.*) Chesser sent Plaintiff's emails to Harris and explained that it was unusual that Plaintiff did not remember to record 20 hours of on-call time and that she had submitted time for future dates. (*Id.*) Plaintiff denies that her email to Chesser requested work for dates and times in the future. Plaintiff explained in her deposition that when she sent her on-call time logs to Chesser, she opened a previous email she had already sent to Chesser, added new time entries as Chesser had suggested, and then sent the email to Chesser again. (Pl.'s Resp. to Accredo's Statement of Fact ¶ 12.)

Chesser decided to approach Harris with her concerns about the discrepancies in the email. (Def. Accredo's Statement of Undisputed Fact ¶ 11.) Chesser advised Plaintiff that her report of on-call time was under review. (*Id.*) Harris investigated the issue of Plaintiff's August 2013 on-call time by obtaining Plaintiff's company cell phone records from corporate security and checking the records against Plaintiff's time log. (*Id.* ¶ 12.)[10] Harris could not verify all of Plaintiff's on-call time. (*Id.*) For example, Plaintiff reported contact with a Work at Home employee on August 24, 2013 at 2:15 p.m., 2:45 p.m., and 3:21 p.m., entitling Plaintiff to two hours of on-call pay. (*Id.*) Harris found that the phone records for Plaintiff's company cell phone showed only one call lasting two minutes and from a number that did not match the information on Plaintiff's time log. (*Id.*)[11] Harris created a spreadsheet analyzing Plaintiff's on-call time and gave it to Jodi Bruhn, then-senior human resources manager, on September 10, 2013. (*Id.* ¶ 13.)

On August 28, 2013, Harris informed Work at Home coordinators and their manager that they would no longer perform on-call work effective August 30, 2013, and that the company was implementing a new organizational structure. (*Id.* ¶ 14.) Going forward, Work at Home coordinators were to report to Tammy Timberlake-Cecil ("Timberlake-Cecil"). (*Id.*) Timberlake-Cecil worked in Warrendale, Pennsylvania, and supervised six Work at Home coordinators. (*Id.* ¶ 3.) Timberlake-Cecil directed all Work at Home employees to contact a service center rather than a Work at Home coordinator when they had problems outside the

---

[10] Plaintiff has responded that Accredo's statement is disputed. However, Plaintiff has not cited any record evidence to show why a genuine dispute exists about the fact asserted. Therefore, the Court finds that Accredo's statement of fact is undisputed for purposes of summary judgment.

[11] Plaintiff has again responded that Accredo's statement is disputed but without citing record evidence to show why a genuine dispute exists. As such, the Court finds that tAccredo's statement of fact is undisputed for purposes of summary judgment.

Work at Home coordinators' normal work hours. (*Id.* ¶ 15.) Also, Work at Home coordinators were no longer issued company cell phones. (*Id.*)

Some time in mid-September 2013, Plaintiff met with Harris and Bruhn to discuss the review of Plaintiff's August 2013 on-call time. (*Id.* ¶ 16.) Timberlake-Cecil participated in the meeting by phone, though Timberlake-Cecil testified in her deposition that at times during the meeting, she could not hear Plaintiff or the other participants who were on speakerphone. (*Id.*) Plaintiff admitted during her deposition that she could not explain why the cell phone records did not support her time log and claim for on-call pay. (*Id.*)[12] Plaintiff now maintains that the inconsistencies could be explained by her practice of using earlier emails to add additional on-call entries to her time log and then submit the amended entries to Chesser. (*Id.* ¶ 17.)[13] According to Accredo, Plaintiff testified at her deposition that she also received calls on her personal cell phone from Work at Home employees when they could not reach her on her company cell phone. (*Id.*) But the parties disagree over whether Plaintiff mentioned calls coming to her personal phone during the September 2013 interview with Harris, Bruhn, and Timberlake-Cecil. (*Id.*)

Plaintiff adds here that Accredo never looked closely at her sent emails to assess her explanation about the times logged in her emails for August 2013. (Pl.'s Resp. to Accredo's Statement of Fact ¶ 18.) Accredo also failed to check with its IT department to analyze the

---

[12] Plaintiff disputes Accredo's statement and adds that she maintained during the interview that she had performed the work and correctly reported her hours. However, Plaintiff has failed to cite any evidence to support her claim. The Court finds then that Accredo's statement of fact is undisputed for purposes of summary judgment.

[13] Plaintiff objects to Accredo's statement as argumentative and adds that Defendant did not question Plaintiff about her call-log reporting habits during the deposition. Plaintiff nevertheless admits her practice explains the alleged inconsistencies. In light of the fact that parties generally argue on Plaintiff's proffered reason for the discrepancies in her on-call time log, the Court finds that Defendant's statement is undisputed for purposes of summary judgment.

emails or question any Work at Home employees to ask them about their calls to Plaintiff or their downtimes reported by Plaintiff in her on-call log. (*Id.*) And Accredo never asked Plaintiff if she used a phone other than her company cell phone to take calls or place calls to Work at Home employees and never asked Plaintiff for personal phone records to support her claims about the disputed calls. (*Id.*)

Management subsequently widened the scope of its investigation into Plaintiff's on-call time submissions. Timberlake-Cecil and Cynthia Thompson, then-senior human resources generalist, decided to expand the inquiry to cover the period from January 2013 to August 2013. (Def. Accredo's Statement of Undisputed Fact ¶ 18.)[14] They reviewed the records for Plaintiff's company cell phone during this period and compared them to the logs for on-call time Plaintiff had submitted to Chesser. (*Id.*) They compiled all of the information into a spreadsheet and concluded that Plaintiff's time logs contained calls that were not found on the phone records. (*Id.* ¶ 19.) The wider investigation found that Plaintiff had submitted 322 hours of on-call time between January 2013 and August 2013, of which only 138 hours was reflected in the company cell phone records. (*Id.*) The result was that 184 hours of Plaintiff's on-call time for this period could not be validated. (*Id.*)[15]

Management concluded the investigation into Plaintiff's on-call time on or about December 19, 2013, and Timberlake-Cecil made the recommendation to terminate Plaintiff's

---

[14] Plaintiff did not actually respond to Accredo's Statement of Fact ¶ 18. Therefore, the Court deems the facts in the statement to be undisputed for purposes of summary judgment.

[15] Defendant adds in a footnote that Plaintiff received discipline for leaving work early on a Friday in November 2013. Plaintiff objects to the relevance and materiality of this fact, arguing that Accredo has cited the proof to discredit Plaintiff in the eyes of the Court. Plaintiff further argues that Accredo has never asserted that it terminated Plaintiff's employment because of her unauthorized early departure. (Pl.'s Resp. to Accredo's Statement of Fact ¶ 18.) The Court finds that Plaintiff's objection is well-taken and therefore declines to consider this proof as part of its analysis of the issues presented at summary judgment.

employment no later than December 20, 2013. (*Id.* ¶ 20.) Human resources reviewed and approved the recommendation the same day. (*Id.*)[16] Management decided on December 20, 2013, to delay notifying Plaintiff about her termination for falsifying time records until after the Christmas holiday. (*Id.* ¶ 21.)

Plaintiff returned to work from the holidays on December 30, 2013, and next worked January 2 and 3, 2014. (*Id.*) Plaintiff then called off work on Monday, January 6, 2014. (*Id.*) According to the summary judgment affidavit of Laura Eikerenkoetter, Accredo's director of human resources, human resources generally partners with managers when employees are advised of their terminations. (Eiekerenkoetter Aff. ¶ 7, ECF No. 78-2).[17] Eikerenkoetter was not in the office on December 30, 2013, or January 2, 2014. (*Id.* ¶ 8.) Eikerenkoetter was in the office on January 3, 2014, but was unable to set a date with Timberlake-Cecil to notify Plaintiff of her termination. (*Id.*) Eikerenkoetter and Timberlake-Cecil discussed when to notify Plaintiff of her termination on January 4, 2014. (*Id.* ¶ 9.) According to Eikerenkoetter, the recommendation to terminate Plaintiff and approval for the termination occurred prior to January 6, 2014. (*Id.* ¶ 10.)

----

[16] Plaintiff disputes this claim and argues that Timberlake-Cecil may have made her recommendation on this date but the investigation was not complete until December 24, 2013. (Pl.'s Resp. to Accredo's Statement of Fact ¶ 20.) Plaintiff cites for support an email referring to additional work still being done to the spreadsheet documenting her on-call time. Plaintiff's point is noted for the record. But the parties seem to be using slightly different terminology and perhaps are referring to different concepts. Accredo's statement of fact refers to Timberlake-Cecil's "recommendation" and HR's "approval" of the recommendation but never mentions an "investigation." Plaintiff's argument that the "investigation" continued even after Timberlake-Cecil had made her "recommendation," if anything, goes to the weight of Timberlake-Cecil's "recommendation." It does not show that a genuine dispute exists about when Timberlake-Cecil made her recommendation.

[17] The Court notes that Defendant submitted Eikerenkoetter's affidavit (ECF No. 78-2) as an exhibit to its reply brief. Plaintiff has not sought leave to respond to the statements in the affidavit or showed why the Court should not consider the affidavit to decide Accredo's Motion for Summary Judgment.

On January 7, 2014, Plaintiff applied for FMLA benefits through Accredo's third-party FMLA carrier AON Hewitt. (*Id.* ¶ 22.) Timberlake-Cecil was not advised of Plaintiff's request for FMLA leave until January 8, 2014. (*Id.*) In fact, Timberlake-Cecil had no knowledge of whether Plaintiff had ever requested or received FMLA benefits prior to January 8, 2014. (*Id.* ¶ 25.)[18] At that point Timberlake-Cecil contacted Eikerenkoetter about Plaintiff's termination. (*Id.*) Eikerenkoetter and Timberlake-Cecil called Plaintiff on January 10, 2014, to inform her about her termination. (*Id.* ¶ 23.) At the time of the call, Plaintiff explained that she was driving and asked Eikerenkoetter to leave her contact information so that Plaintiff could call her back with any questions. (*Id.*) Plaintiff and Eikerenkoetter never spoke again. (*Id.*)[19]

Plaintiff testified in her deposition that she was diagnosed with lupus in 1992. (*Id.* ¶ 27.) Timberlake-Cecil was not aware that Plaintiff had lupus or any other medical condition prior to Plaintiff's termination. (*Id.* ¶ 30.) Plaintiff never told Timberlake-Cecil about her medical condition. (*Id.* ¶ 28.) Plaintiff has no personal knowledge of anyone else informing Timberlake-Cecil about Plaintiff's health condition. (*Id.*)[20] Anita Harris, Accredo's manager of operations,

---

[18] In response to this statement, Plaintiff points out that she gave Timberlake-Cecil notice on January 6, 2014, that she was experiencing a "flare-up" and had to see "what was going on with her body" by visiting her doctor. Nothing in the testimony cited, however, supports Plaintiff's claim that her doctor, Dr. Bowden, had taken her off work or that Plaintiff did not know at that time when she would return to work.

[19] Accredo cites undisputed evidence that on January 24, 2014, AON Hewitt requested additional information from Plaintiff because it did not have sufficient information to evaluate Plaintiff's FMLA claim. (Def. Accredo's Statement of Undisputed Fact ¶ 26.) Plaintiff responds that the fact is immaterial because Accredo had already terminated her employment by that time. The proof is noted here for the record. But the Court tends to agree with Plaintiff that the fact is immaterial.

[20] Plaintiff attempts to dispute this fact by relying on her own testimony in which she described a general custom in the workplace at Accredo where an outgoing supervisor briefed the incoming supervisor on each employee and certain information about the employee. (Pl.'s Resp. to Accredo's Statement of Fact ¶¶ 29, 30.) Accredo objects to Plaintiff's testimony as

did not know Plaintiff had lupus. (*Id.* ¶ 29.)[21] However, the parties dispute whether Pamela Chesser knew about Plaintiff's lupus: Plaintiff testified at her deposition that she had discussed her condition with Chesser while Chesser testified that she did not know about it.[22] Even accepting as true Plaintiff's testimony that Chesser did know about Plaintiff's lupus, there is no proof that Chesser relayed the information to Timberlake-Cecil. (*Id.*) Accredo maintains an official non-discrimination policy against employees on the basis of disability. (*Id.* ¶ 36.) As part of its policy, Accredo attempts to make "reasonable accommodations in accordance with the law for qualified individuals with known disabilities." (*Id.* ¶ 36.)

Concerning Plaintiff's FSLA claim, on November 7, 2013, Plaintiff emailed Jodi Bruhn, at that time the senior human resources manager, about her unpaid claim for on-call pay for the period between August 25, 2013, and September 7, 2013. (*Id.* ¶ 31.) Bruhn responded to Plaintiff's email and stated that management could not verify the time against the records for

---

speculative. "The nonmoving party cannot create a genuine dispute of material fact through mere speculation, conjecture, or fantasy." *Thompson I.G., LLC v. Edgetech I.G. Inc.*, 590 F. App'x 532, 537 (6th Cir. 2014) (citation omitted). No foundation was laid to show that Plaintiff had personal knowledge of such a custom, and Plaintiff's testimony is not based on any specific instance where supervisors discussed a subordinate employee's health information. As a result, Plaintiff has not shown how her testimony is anything more than speculation.

[21] Plaintiff disputes this claim but without citation to record evidence. The Court finds that Accredo's statement of fact is undisputed for purposes of summary judgment.

[22] Plaintiff further testified that Timberlake-Cecil would have learned about her health condition from Chesser when Timberlake-Cecil took over as Plaintiff's supervisor. Plaintiff admitted in her deposition that she had no personal knowledge of the conversations Timberlake-Cecil had with Chesser or Harris. Phipps Dep. 259:2-20, Feb. 24, 2016 (ECF No. 73-2). Just as with her testimony about a general custom or culture at Accredo of supervisors sharing employee health information, Plaintiff's testimony about any conversation between Chesser and Timberlake-Cecil is inadmissible speculation. Plaintiff also attempts to use other testimony from her deposition to show that Timberlake-Cecil regarded her as disabled. (Pl.'s Resp. to Accredo's Statement of Fact ¶ 30.) However, the testimony cited only shows that Plaintiff asked for time off on unspecified days because she was "not feeling well" or needed time "to take care of some personal issues." Phipps Dep. 237:4-12. Plaintiff also admitted that her requests for time off never referred to her lupus. *Id.* at 236:13-21 ("It's my health. I just wasn't specific as far as telling her Tammy, I have lupus, I need to be off.").

11

Plaintiff's company cell phone and therefore would not approve her request. (*Id.*) Plaintiff did not raise the request for on-call pay again with Bruhn or Timberlake-Cecil. (*Id.* ¶ 32.) Other than Plaintiff's request for on-call pay for work performed in August 2013, Timberlake-Cecil was not aware of any complaints by Plaintiff for additional overtime pay. (*Id.* ¶ 33.) Prior to Plaintiff's termination, Timberlake-Cecil was not aware of any complaint by Plaintiff for violations of the FMLA or FLSA, other than her request for the August 2013 on-call pay. (*Id.* ¶ 34.) Plaintiff filed a complaint with the United States Department of Labor in January or February 2014 alleging a violation of the FMLA against Accredo. (*Id.* ¶ 35.)

With respect to Defendant Express Scripts Administrators, LLC, the Court finds the following facts to be undisputed for purposes of summary judgment. When Plaintiff was hired on August 14, 2006, she was hired by Accredo. (Def. Express Scripts Admins.' Statement of Undisputed Facts ¶ 1.) Accredo issued Plaintiff's IRS W-2 forms. (*Id.* ¶ 2.) Accredo has its principal place of business in Memphis, Tennessee; whereas, Express Scripts has its principal place of business in St. Louis, Missouri. (*Id.* ¶ 3.) Accredo and Express Scripts do not share any offices, bank accounts, equipment, or recordkeeping. (*Id.* ¶ 4.)[23] Plaintiff adds that Express Scripts was listed on Plaintiff's Tennessee Department of Labor separation notice and her 2012 year-end review. (Pl.'s Resp. to Express Scripts Admins.' Statement ¶ 4.)

All of the individuals to whom Plaintiff reported are employees of Accredo: Pamela Chesser, Anita Harris, and Tammy Timberlake-Cecil. (Def. Express Scripts Admins.' Statement of Undisputed Facts ¶ 5.) Plaintiff points out that each of these employees had email signatures

---

[23] Plaintiff disputes this statement but without citing any evidence to show why the facts as stated are genuinely in dispute. Plaintiff has only shown that her 2012 year-end review and her DOL separation notice referred to "Express Scripts." The Court notes this evidence for the record. However, even accepting these exhibits are true and authentic, the Court finds that they do not call into doubt the other facts asserted in this particular statement. As such, the Court finds that Accredo's statement of fact is undisputed for purposes of summary judgment.

suggesting that they were employees of "Express Scripts." (Pl.'s Resp. to Express Scripts Admins.' Statement ¶ 5.) Defendants add that Harris and Chesser's email addresses ended with "@accredohealth.com" and that the signature blocks referenced by Plaintiff actually stated "Accredo, an Express Scripts Specialty Pharmacy." (Def.'s Reply ¶ 5.) As for Timberlake-Cecil, the record does not show what her email address was or that her email signature block contained any reference to Accredo or Express Scripts.

Each company controlled its own day-to-day operations and personnel matters, including hiring, firing, promotion, discipline, and employee compensation. (Def. Express Scripts Admins.' Statement of Undisputed Facts ¶ 6.)[24] Express Scripts Administrators was not involved in any decision to hire, compensate, promote, discipline, or discharge Plaintiff, though Plaintiff's Tennessee Department of Labor notice of separation lists "Express Scripts" as Plaintiff's employer. (*Id.* ¶ 7.) According to Express Scripts Administrators, Accredo independently made the decision to discharge Plaintiff; Timberlake-Cecil recommended the termination and human resources reviewed and approved her recommendation. (*Id.* ¶ 8.) Plaintiff cites more email evidence showing that Cynthia Thompson, one of the HR employees who communicated with Plaintiff about her on-call time logs, had an email signature block with "Express Scripts, Inc." Plaintiff also cites emails from Jodi Bruhn, then human resources manager, where Bruhn's email signature block shows that her email address ended with "@accredohealth.com" and had a logo below it with the words "EXPRESS SCRIPTS." (Pl.'s

---

[24] Plaintiff disputes this statement of fact and asserts that the companies "share policies, email signatures, and Human Resources functions including Year End Reviews and Tennessee Department of Labor Separation Notices." (Pl.'s Resp. to Express Scripts Admins.' Statement ¶ 6.) But none of the evidence cited actually establishes a genuine dispute. The Court has already noted the proof about email signatures, Plaintiff's 2012 year-end review, and her DOL separation notice. Plaintiff has cited no evidence to show that the two companies "share policies" and "Human Resources functions" and has otherwise failed to contest Defendant's statement of fact.

Resp. to Express Scripts Admins.' Statement ¶ 8.) The evidence cited by Plaintiff does not contest Defendant's claim that Timberlake-Cecil was an employee of Accredo.

Pursuant to Local Rule 56.1(b)(3), a non-moving party may file a "concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried." Plaintiff has submitted a statement of additional facts as part of her opposition to Defendants' Motions for Summary Judgment, and Defendants have responded.[25] Plaintiff gave notice on January 6, 2014, that she was experiencing a "flare-up" and had to see "what was going on with her body" by visiting her doctor. (Pl.'s Statement of Add'l Fact ¶ 1.)[26] Timberlake-Cecil received notice of Plaintiff's request for FMLA leave on Wednesday, January 8, 2014.[27] (Id. ¶ 3.) Accredo allowed Plaintiff to continue working through the holidays after the recommendation to terminate her had been made. (Id. ¶ 4.) When Plaintiff returned to work from the holidays on December 30, 2013, Accredo did not discharge her. (Id. ¶¶ 5, 21.) Plaintiff was scheduled to be off on December 31, 2013, and January 1, 2014, for the New Year's Eve holiday. (Id. ¶ 7.) Plaintiff continued to work through January 3, 2014. (Id. ¶ 6.) Accredo did not terminate Plaintiff's employment until after Timberlake-Cecil received notice of Plaintiff's request for FMLA leave. (Id. ¶¶ 9, 19.) When Plaintiff called in sick and spoke to Timberlake-Cecil on January 6, 2014, Timberlake-

---

[25] Technically, Plaintiff's statement is by and large a restatement of undisputed facts already introduced in Accredo's statement of undisputed facts. Strictly speaking, Plaintiff's statement does not comply with Local Rule 56.1(b)(3).

[26] Plaintiff also asserts that her doctor had taken her off work and that she told Timberlake-Cecil she did not know when she would return to work. However, as previously noted, nothing in the testimony cited supports Plaintiff's claim that her doctor, Dr. Bowden, had taken her off work or that Plaintiff did not know at that time when she would return to work.

[27] Plaintiff's statement of additional facts actually asserts that the notice was received on January 8, 2015, instead of 2014. This appears to be a typographical error.

Cecil did not tell Plaintiff she was being terminated but remarked that another employee was out on leave and the office was understaffed.  (*Id.* ¶ 10.)[28]

Accredo's Rule 30(b)(6) representative testified that the company still had Timberlake-Cecil's recommendation to terminate Plaintiff under review as of January 1, 2014, but also that the decision to terminate Plaintiff was made December 20, 2013.  (*Id.* ¶ 11.)  Accredo responds with an affidavit from Eikerenkoetter that the decision to terminate Plaintiff was approved by human resources prior to January 6, 2014.  (Def. Accredo's Resp. to Pl.'s Statement of Add'l Facts ¶ 11.)  The evidence shows that Accredo could have suspended Plaintiff for the suspected time falsification but did not do so.  (Pl.'s Statement of Add'l Fact ¶¶ 12, 25.)[29]  According to Accredo, the company could terminate an employee within 24 hours of a termination decision. (*Id.* ¶¶ 14, 22.)  But in this instance, Accredo waited several weeks after making the decision to terminate Plaintiff before it actually fired her.  (*Id.* ¶¶ 15, 27.)  In fact, Accredo never issued a write-up over Plaintiff's time keeping or even gave her notice that management was investigating her time or considering discipline against her for falsifying time.  (*Id.* ¶¶ 23, 24.) Defendant adds that the delay between management's decision to terminate and Plaintiff's actual termination occurred due to the holidays, the fact that Plaintiff worked only three days after the holidays more before taking FMLA leave, the human resources director's (Eikerenkoetter)

---

[28] Plaintiff asserts that Timberlake-Cecil's comments discouraged Plaintiff from taking FMLA leave and constitute direct evidence of discrimination against Plaintiff for taking FMLA leave.  (Pl.'s Statement of Add'l Fact ¶ 26.)  Plaintiff's assertion, however, is not actually a statement of fact but a legal argument about the evidence itself, namely, a characterization of what the evidence tends to show.

[29] Plaintiff asserts in her statement of additional facts that Accredo "allowed an employee whom it accused of theft to carry an Accredo issued American Express card."  (Pl.'s Statement of Add'l Fact ¶ 13.)  Defendant does not dispute the statement.  However, the statement is ambiguous.  The Court presumes that the employee was Plaintiff.  The Court cannot be sure though because the evidence cited to support the claim was not included with the record.  The Court notes the existence of the apparently undisputed fact here for the record.

absence from the office until January 3, and the departure of the senior human resources generalist who had worked with Timberlake-Cecil on the review of Plaintiff's on-call time logs. (Def. Accredo's Resp. to Pl.'s Statement of Add'l Facts ¶ 15.)[30]

Just as she did in response to Defendant's statement of undisputed facts, Plaintiff again asserts that "the investigation" into her time reporting was not complete as of December 24, 2013. (Pl.'s Statement of Add'l Fact ¶ 16.) Plaintiff cites for a support a chain of emails between Timberlake-Cecil and Cynthia Thompson, the human resources generalist who apparently left her employment with Accredo some time in late December 2013 or early January 2014. The Court finds that the emails speak for themselves. But the emails cannot be read to say that an "investigation" was ongoing. On December 18, 2013, Timberlake-Cecil addressed an email to Thompson, asking for an "update" on Plaintiff's case. On December 19, 2013, Timberlake-Cecil addressed a second email to Thompson, providing a summary table of the time issue and attaching a separate spreadsheet. On December 20, 2013, Timberlake-Cecil sent Thompson a third email and suggested that the termination be delayed until December 30, 2013, due to the holidays, the fact that Plaintiff had children, and Plaintiff's absence from the office during the week after Christmas. Thompson responded to Timberlake-Cecil's email about an hour later and stated simply "Ok. Thank you."

---

[30] Plaintiff alleges in separate paragraphs of her statement of additional fact that there is "also strong evidence that Accredo's stated reason for delaying Ms. Phipps' termination due to the fact that Ms. Jodi Bruhn had not returned to the office is false" and that Plaintiff was terminated without Bruhn's involvement. (Pl.'s Statement of Add'l Fact ¶¶ 28, 29.) Plaintiff cites evidence from the record as support for her assertions. But the pages cited do not support Plaintiff's claim about Bruhn's absence or what role Bruhn did or did not play in the decision to terminate Plaintiff. If any thing, Plaintiff's statements are comments on the possible inferences from the evidence about the delay between Timberlake-Cecil's recommendation to terminate Plaintiff and her actual termination date.

On December 24, 2013, Timberlake-Cecil emailed Thompson to inform her that Plaintiff would only work from 8 a.m. to noon on December 30, 2013, because of an appointment. Thompson responded later the same evening asking Timberlake-Cecil to include additional details in her spreadsheet, explaining that "[t]here was additional work that needed to occur with the consolidated file as this will potentially be reviewed by other parties and the information needs to be clear."[31] Viewed in the light most favorable to Plaintiff, the emails show that human resources had not yet made a final determination about the recommendation to terminate Plaintiff. Rather than showing that management continued to investigate the case, the emails show that human resources had Timberlake-Cecil's recommendation under consideration but asked Timberlake-Cecil to include greater detail in her original spreadsheet for the sake of a fully documented file to support the grounds for termination.[32]

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[33] The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a

---

[31] *See* Email ex. 18 to Timberlake-Cecil Dep. (ECF No. 73-3).

[32] The Court finds that the rest of the statements in Plaintiff's statement of additional facts are not fact statements so much as legal conclusions or Plaintiff's commentary on facts the parties have already introduced elsewhere in their summary judgment submissions. (Pl.'s Statement of Add'l Fact ¶¶ 30-44.) While there is certainly nothing improper about Plaintiff's submission of the statements, the statements do not aid the Court in its assessment of which facts are genuinely in dispute for purposes of the Motions for Summary Judgment. The statements are actually counsel's characterization of the facts and therefore better considered as part of the parties' legal arguments. As such, the Court declines to reproduce each of the statements here and will instead consider them in its analysis of the arguments.

[33] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

question of law, it is a legal question that sits near the law-fact divide."[34] In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party,[35] and the "judge may not make credibility determinations or weigh the evidence."[36] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[37] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[38] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[39] In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."[40]

When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[41] Summary judgment must be entered

---

[34] *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009).

[35] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[36] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[37] *Celotex*, 477 U.S. at 324.

[38] *Matsushita*, 475 U.S. at 586.

[39] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[40] *Lord v. Saratoga Cap., Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[41] *Anderson*, 477 U.S. at 251–52.

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[42]

## ANALYSIS

The Court holds that Defendants are entitled to judgment as a matter of law on some but not all of Plaintiff's causes of action. The Court considers each theory of recovery separately.

### I. Claims Against Express Scripts Administrators, LLC

Before turning to the merits of Plaintiff's substantive claims for relief, the Court takes up Defendant Express Scripts Administrators, LLC's separate Motion for Summary Judgment. In it Express Scripts Administrators argues that it was not Plaintiff's employer and thus cannot be liable to Plaintiff on any of her claims. In the alternative, Express Scripts Administrators adopts by reference all of the arguments made in Accredo's Motion for Summary Judgment. Plaintiff responds that genuine issues of material fact remain about whether Accredo and Express Scripts Administrators were her joint employers. For the reasons that follow, the Court holds that Plaintiff has failed to make such a showing.

"Entities are joint employers if they share or co-determine those matters governing essential terms and conditions of employment."[43] The determination of whether one entity is a joint employer with another entity is guided by the following criteria: the "entity's ability to hire, fire, or discipline employees, affect their compensation and benefits, and direct and supervise their performance."[44] By and large, the undisputed evidence before the Court does not show that Express Scripts Administrators, LLC was Plaintiff's joint employer. Defendants have shown

---

[42] *Celotex*, 477 U.S. at 322.

[43] *E.E.O.C. v. Skanska USA Bldg., Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013) (quoting *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985)).

[44] *Id.*

that Plaintiff was hired by Accredo and worked under the supervision of other Accredo employees throughout her tenure. Plaintiff's day-to-day work was controlled and supervised by Accredo employees. And the ultimate recommendation to fire Plaintiff came from an Accredo employee.

On the other hand, it is plausible that some other company could be considered Plaintiff's joint employer in this case. For example, Plaintiff has shown that some of the other personnel with whom she dealt identified themselves in emails as employees of Express Scripts, Inc. or of "Accredo, an Express Scripts Specialty Pharmacy." And Plaintiff's own notice of separation identified her employer not as Accredo Health Group, Inc. but as "Express Scripts." Laura Eikerenkoetter, the human resources director who communicated Plaintiff's termination to her, states in her summary judgment affidavit that her office was located in St. Louis, Missouri, where Express Scripts Administrators, LLC has its principal place of business. Perhaps more importantly, Eikerenkoetter's affidavit never states the identity of Eikerenkoetter's employer. It merely indicates that she is "employed as a Human Resources Sr. Director" and that in "2013 and 2014 [she] supported the department within Accredo Health Group, Inc. ('Accredo') that was directed by Tammy Timberlake-Cecil."[45]

The Court finds that the evidence presents a close call. While there is proof of the involvement of other individuals, individuals who were not directly employed by Accredo, none of the evidence shows that Express Scripts Administrators, LLC actually "co-determine[d] those matters governing essential terms and conditions of [Plaintiff's employment]" or had the authority to hire, fire, or discipline Plaintiff, or affect her pay and benefits or direct and supervise

---

[45] Eikerenkoetter Aff. ¶ 2 (ECF No. 78-2).

her job duties.[46]  Plaintiff has not shown what organizational structure connected Express Scripts Administrators, LLC to Accredo or how that structure somehow conferred on Express Scripts Administrators, LLC the authority to alter or amend the terms and conditions of Plaintiff's employment with Accredo, up to and including her termination.   There is simply not enough evidence from which a reasonable juror could find that Express Scripts Administrators, LLC was Plaintiff's joint employer.  Therefore, the Court holds that Express Scripts Administrators, LLC is entitled to judgment as a matter of law.

## II. FMLA Interference

The FMLA makes it unlawful for employers "to interfere with, restrain, or deny the exercise or the attempt to exercise any right provided under [the FMLA]."[47]   Under an interference or entitlement theory,[48] "any violation of the FMLA–or of the regulations implementing it–constitutes . . . unlawful interference."[49]  The Sixth Circuit has explained that the employer's intent is not relevant to the analysis of an FMLA interference claim,[50] although the FMLA is not a strict-liability statute.[51]  In other words, "the mere occurrence of interference

---

[46] *Skanska USA Bldg.*, 550 F. App'x at 256.

[47] 29. U.S.C. § 2615(a)(1).

[48] *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (noting that some courts refer to FMLA's interference theory as the entitlement theory).

[49] 29 C.F.R. § 825.220(b); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004).

[50] *Edgar*, 443 F.3d at 507 (quoting *Arban v. West Pub. Corp.*, 345 F.3d 390 (6th Cir. 2003) ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.").

[51] *Id.* at 507–508.

with an employee's FMLA rights is not a *per se* FMLA violation."[52]  An employee alleging an interference claim against his employer must still establish that the employer's violation caused him harm.[53]

At the outset, the Court holds that Plaintiff has not introduced direct evidence of FMLA interference.  "Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."[54]  When presented with direct evidence, a finder of fact need not draw any inferences to decide that the employer's actions were the result, in whole or in part, of discrimination.[55]  "Direct evidence must prove not only discriminatory animus but that the employer acted on that animus."[56]  Simply put, "[d]irect evidence explains itself."[57]  Plaintiff cites Timberlake-Cecil's comments during their phone conversation on January 6, 2014, as direct evidence of FMLA interference.  In response to Plaintiff's request for time off, Timberlake-Cecil apparently told Plaintiff that another Work at Home coordinator was on leave and that the office was short-handed.  A jury would be required to make more than one inference from these comments to find that they constitute interference with Plaintiff's FMLA rights.  Therefore, the remarks do not amount to direct evidence of

---

[52] *Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 394 (6th Cir. 2009).

[53] *Edgar*, 443 F.3d at 507–508 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

[54] *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013) (quoting *Thompson v. City of Lansing,* 410 F. App'x 922, 929 (6th Cir. 2011)).

[55] *Id.* at 914-15.

[56] *Echols v. Kalamazoo Pub. Sch.*, 508 F. App'x 392, 396 (6th Cir. 2012) (citing *Amini v. Oberlin Coll.,* 440 F.3d 350, 370 (6th Cir. 2006)).

[57] *Martinez*, 703 F.3d at 916.

discrimination.[58]

Having concluded that Plaintiff's case is based on circumstantial proof, the *McDonnell Douglas* burden-shifting framework applies to her FMLA interference claim.[59]  To establish a claim for interference, Plaintiff must demonstrate by a preponderance of the evidence that (1) she was an eligible employee; (2) the defendant was a covered employer under the FMLA; (3) she was entitled to take leave under the FMLA; (4) she notified her employer of her intent to take leave; and (5) the employer denied her benefits or rights to which she was entitled under the FMLA.[60]  "[A]n employer may [not] use an employee's taking of FMLA leave as a negative factor in [an] employment action. . . ."[61]  As the Sixth Circuit has explained, "[i]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled."[62]

But "interference with an employee's FMLA rights does not constitute a violation if the

---

[58] Plaintiff has also cited somewhat ambiguous comments from other Accredo managers, disparaging employees who took FMLA leave.  "[G]eneral, vague, or ambiguous comments do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus."  *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013) (quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008)).  Moreover, Plaintiff has not shown when exactly the comments were made or that any of the comments came from relevant decisionmakers in her case.  *Worthy v. Michigan Bell Tel. Co.*, 472 F. App'x 342, 347 (6th Cir. 2012).

[59] *Donald v. Sybra, Inc.*, 667 F.3d 757, 761-62 (6th Cir. 2012).

[60] *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014).

[61] 29 C.F.R. § 825.220(c); *see, e.g., Brenneman*, 366 F.3d at 422.

[62] *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007).

employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct."[63]  "An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave."[64]  Where the employer proffers a legitimate reason for taking an adverse action unrelated to the employee's exercise of FMLA rights, the plaintiff must rebut the employer's reason by showing that the reason is a pretext for discrimination.[65]

The Court holds that genuine issues of material fact remain as to Plaintiff's FMLA interference claim.  First, Plaintiff has adduced evidence to establish each element of her prima facie case.  Defendants do not dispute that Plaintiff was an eligible employee, that Accredo was a covered employer, that Plaintiff was entitled to FMLA leave, or that she notified Accredo of her intent to take FMLA leave.  The only element contested at summary judgment is whether Accredo denied Plaintiff benefits or rights to which she was entitled under the FMLA.  "This inquiry is an objective one divorced from the employer's motives, with the central question being simply whether the employee was entitled to the FMLA benefits at issue," meaning "12 weeks of leave (with continued insurance coverage) and restoration to the employee's previous position or an equivalent one."[66]  As the Sixth Circuit has commented in dicta, "every discharge of an employee while she is taking FMLA leave interferes with an employee's FMLA rights."[67]

---

[63] *Demyanovich*, 747 F.3d at 431 (citing *Edgar*, 443 F.3d at 508); *see also Romans v. Mich. Dept. of Human Servs.*, 668 F.3d 826, 841 (6th Cir. 2012).

[64] *Wallace v. FedEx Corp.*, 764 F.3d 571, 590 (6th Cir. 2014) (quoting *Arban*, 345 F.3d at 401).

[65] *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008).

[66] *Edgar*, 443 F.3d at 511 (citing 29 U.S.C. §§ 2612(a)(1), 2614(a)(1)).

In this case, Plaintiff was on FMLA leave at the time of her termination in January 2014. This proof suffices to make out the final element of Plaintiff's prima facie case of FMLA interference.

Accredo resists this conclusion by arguing that management had already decided to terminate Plaintiff's employment before she ever requested medical leave. In other words, Accredo took action against Plaintiff for a legitimate disciplinary reason unrelated to her FMLA leave. According to Accredo then, Plaintiff cannot show Accredo interfered with her FMLA rights or denied her medical leave because her termination would have occurred regardless of her request. Accredo's argument goes to whether Accredo had justification for terminating Plaintiff unrelated to her FMLA medical leave (the second stage of the burden shifting framework) and ultimately whether Plaintiff can show that Accredo's legitimate reasons for discharging her were pretextual. Accredo has effectively conflated the showings for each stage of the burden shifting analysis. The Court finds that Accredo's point is better addressed at the second and third stages of the Court's burden-shifting analysis. In any event, Accredo has not shown that Plaintiff cannot make out her prima facie case of FMLA interference.

Second, Accredo has established a legitimate reason for discharging Plaintiff. Accredo claims that it fired Plaintiff for falsifying her on-call time log. The undisputed evidence shows that Plaintiff's on-call time log for August 2013 raised questions about Plaintiff's claims for on-call pay. Management conducted an investigation into Plaintiff's submissions for on-call pay for the period between January 2013 and August 2013 (when Accredo discontinued the practice of on-call time). Based on the results of the investigation, management found that 184 hours of Plaintiff's on-call time for this period could not be confirmed when checked against company

---

[67] *Festerman v. Cnty. of Wayne*, 611 F. App'x 310, 318 (6th Cir. 2015) (quoting *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 980 (8th Cir. 2005)).

cell phone records. Accredo concluded that Plaintiff had falsified her time entries. This is obviously a legitimate basis for ending Plaintiff's employment. "Fraud and dishonesty constitute lawful, non-retaliatory bases for termination."[68] The Court holds then that Accredo has carried its burden to produce a legitimate, non-FMLA reason for Plaintiff's termination.

The burden now shifts back to Plaintiff to show that Defendants' proffered reason is a pretext for discrimination. Plaintiff may establish pretext by showing that Accredo's proffered reason (1) has no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action.[69] An employer's reasons cannot be pretextual "unless it is shown both that the reason was false, and that discrimination was the real reason."[70] In this case Plaintiff essentially argues that the alleged falsification of her time records did not actually motivate the decision to terminate her. Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could find that Defendants used Plaintiff's leave against her in deciding to terminate her.

The evidence shows that management began its investigation into Plaintiff's on-call time in August 2013 and had the matter under consideration until December 2013. At no time, however, did management ever notify Plaintiff that it was considering termination or any other disciplinary action for her timekeeping infractions. Timberlake-Cecil did not make her recommendation to terminate Plaintiff until December 20, 2013, and suggested that the termination not take effect until after the holidays. Even then Plaintiff worked at least three days

---

[68] *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 284 (6th Cir. 2012) (citations omitted).

[69] *Id.* at 285 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

[70] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphases and quotation marks omitted).

after Christmas and possibly would have continued working for some days more, had she not requested FMLA leave on January 7, 2014. In fact, when Plaintiff spoke to Timberlake-Cecil about her need for time off on January 6, 2014, Timberlake-Cecil discouraged Plaintiff from missing work because another Work at Home coordinator was already on FMLA leave and she needed Plaintiff to work. Management finally notified Plaintiff of her termination on January 10, 2014, approximately three weeks after Timberlake-Cecil recommended Plaintiff's termination but only days after Plaintiff had requested FMLA leave. A reasonable juror could find from this evidence that whatever concerns management had about Plaintiff's on-call time, management was willing for Plaintiff to continue working at Accredo, at least until she had a need for FMLA leave. The Court concludes then that Plaintiff's entitlement to FMLA leave and the grounds supporting her interference claim is a question for a jury.

The facts of this case bear a striking similarity to the facts in *Arban v. West Publishing Corp.* Like Plaintiff, the employee in *Arban* was suspected of falsifying company documents, specifically sales reports which would generate higher commissions for the employee. Just as in the case at bar, management discovered the issue and began to discuss appropriate disciplinary action, including termination, but waited until after the Christmas holidays to notify the plaintiff that he would lose his job. Before management could carry out the termination, the plaintiff took FMLA leave. The Sixth Circuit noted that there was "considerable evidence that the decision to terminate Arban had been made before Arban went on medical leave but that his actual termination had been deferred until after the holidays."[71] However, once the plaintiff was on FMLA leave, his direct supervisor contacted him a number of times asking him to turn over sales information, which would allow another employee to earn possible sales incentives before the

---

[71] *Arban,* 345 F.3d at 401.

end of the year. When the plaintiff initially hesitated to perform any activities that might constitute work while on medical leave, management pressed him to turn over the information and within days fired him. In the final analysis, the Sixth Circuit concluded that the defendant in *Arban* was not entitled to a directed verdict on the plaintiff's FMLA claim based on "both the timing and the reasons for the decision to terminate [the plaintiff]."[72] "[T]he timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on incidents of which the employer had already been aware)."[73] For the same reasons, the Court concludes that Defendants are not entitled to judgment as a matter of law on Plaintiff's FMLA interference claim.

Before leaving Plaintiff's FMLA interference claim, the Court notes the parties' arguments about the applicability of the honest belief rule to Plaintiff's FMLA interference claim. The honest belief rule entitles an employer to summary judgment even where a factual dispute exists at the pretext stage over the employer's reasons for taking an adverse action against the employee so long as "the employer held an honest belief in its proffered reason."[74] The honest belief rule shields the employer "even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless."[75] "[T]he key inquiry is whether the employer made a

---

[72] *Id.*

[73] *Id.* at 402 (quoting *Kohls v. Beverly Enters. Wisc., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001)).

[74] *Seeger*, 681 F.3d at 285-86.

[75] *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

reasonably informed and considered decision before taking an adverse employment action."[76]

Plaintiff argues that the Sixth Circuit has held in an unreported decision that the honest belief rule does not apply in FMLA interference cases, while Defendants argue that Plaintiff misreads the case law and that the honest belief rule should apply to defeat Plaintiff's FMLA interference cases.

The Sixth Circuit's reported decisions in this area have left the issue open. In its most recent unreported decision, one panel of the Court of Appeals specifically held that the honest belief rule does not apply to FMLA interference claims. The panel's full discussion of the issue was as follows:

> As this court has noted, "the 'honest belief' defense fits neatly into the retaliation context, where the legal standard inherently demands an employer's culpable mental state i.e., that the employee's exercise of FMLA [or ADA] rights *caused* the employer to *discriminate* against the employee." *Tillman v. Ohio Bell Telephone Co.*, 545 Fed.Appx. 340, 351 (6th Cir. 2013). However, the honest belief rule is *not* applicable to claims where the employer's frame of mind is not at issue, FMLA interference claims for example. *Id.* There, an employer who honestly, but mistakenly believes that the employee used up all his FMLA leave can still be said to have interfered with the exercise of the employee's rights under the FMLA. *Id.* at 352. Though both types of claims are at issue in this case, the district court properly limited its application of the honest belief rule to its analysis of Banks's retaliation claims.[77]

In light of this persuasive authority, the Court holds that the honest belief rule does not apply as a defense to Plaintiff's FMLA interference claim. Therefore, Defendants' Motions for Summary Judgment are **DENIED** as to Plaintiff's FMLA interference claim.

## II. FMLA Retaliation

An employer may not "discharge or in any other manner discriminate against an

---

[76] *Smith*, 155 F.3d at 807.

[77] *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 533 (6th Cir. 2015).

individual for opposing any practice made unlawful by [the FMLA]."[78] An FMLA retaliation claim is different than an interference claim, because under a retaliation theory, the intent of the employer matters.[79] "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights."[80] Retaliation claims may be proved with either direct or indirect evidence.[81] "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."[82]

Where as here a plaintiff relies on indirect evidence, courts analyze the claim under the three-step *McDonnell Douglas* burden-shifting framework.[83] To establish a prima facie case of retaliation, the employee must demonstrate that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity.[84] Once the plaintiff has

---

[78] 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220.

[79] *Edgar*, 443 F.3d at 508.

[80] *Id.*

[81] *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

[82] *Id.*; *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

[83] *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008); *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) ("An FMLA retaliation claim based solely upon circumstantial evidence of unlawful conduct is evaluated according to the tripartite burden-shifting framework set forth in *McDonnell Douglas*.").

[84] *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000).

established a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its action.[85] If the employer has articulated a legitimate reason for its action, the plaintiff must then demonstrate that "the proffered reason was not the true reason for the employment decision."[86]

The Court holds that genuine issues of material fact remain over Plaintiff's FMLA retaliation claim. As an initial matter, Plaintiff can make out a prima facie claim of FMLA retaliation. It is undisputed that Plaintiff engaged in activity protected by the FMLA and that she suffered an adverse employment action. For purposes of summary judgment, Defendants only challenge Plaintiff's proof of a causal connection between her FMLA request and her termination. The Sixth Circuit has held that "in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."[87] In fact, the Court of Appeals has concluded in an FMLA retaliation case that a span of two months between an employee's notice of a need for medical leave and the employee's subsequent termination is enough to establish a causal connection.[88] In this case, Plaintiff first requested FMLA leave on January 6 or 7, 2014, and lost her job on January 10, 2014, a matter of days, not months. This proof easily satisfies Plaintiff's "low threshold of proof" to establish causation. The Court holds then that Plaintiff has carried her burden to create

---

[85] *Bell v. Prefix, Inc.*, 321 F. App'x 423, 426 (6th Cir. 2009).

[86] *Morris*, 201 F.3d at 792–93.

[87] *Seeger*, 681 F.3d at 283 (collecting cases).

[88] *Id.*

an inference of retaliation.[89]

Next, Defendants have proffered a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. Defendants assert that Accredo fired Plaintiff for falsifying timesheets for her on-call time. For the reasons explained in its analysis of the interference claim, the Court finds that Accredo's proffered reason, Plaintiff's falsification of time logs, is a legitimate ground for termination. The burden now shifts back to Plaintiff to show that Defendants' proffered reason is a pretext for discrimination. Just as before, Plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action.[90] While Plaintiff cannot rely on temporal proximity alone to establish pretext, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence."[91] "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him."[92]

The Court holds that Plaintiff has presented enough proof to cast doubt on Accredo's proffered reason for her termination and whether her timekeeping infractions actually motivated the decision to terminate her, particularly in light of the timing of her termination. The Court has

---

[89] Defendants disagree and again rely on the undisputed evidence that the decision to terminate Plaintiff was made before she engaged in protected FMLA activity. The Court finds Defendants' argument unconvincing because it conflates Plaintiff's burden at the prima facie stage with her burden to rebut at the pretext stage Defendants' legitimate reasons for terminating her.

[90] *Id.* at 285 (citing *Dews*, 231 F.3d at 1021).

[91] *Id.* (citing *Bell*, 321 F. App'x at 431).

[92] *Id.* (citing *Clark v. Walgreen Co.*, 424, F. App'x 567, 474 (6th Cir. 2011)).

already fully analyzed the proof supporting such a view of the evidence. Plaintiff was fired within days of requesting FMLA leave. In addition to the remarkably close temporal proximity between her protected request for leave and her termination, other independent proof strenghtens a reasonable inference of improper motive. Plaintiff had been under investigation for serious time reporting issues related to her on-call time for many months. Accredo initiated the inquiry in August 2013 and met with Plaintiff in September 2013 to question her about her time logs. Accredo then waited until January 2014 to discharge Plaintiff for the offense, and then only after she had requested FMLA leave. And when Plaintiff initially reported to Timberlake-Cecil that she needed time off on January 6, 2014, Timberlake-Cecil never mentioned Plaintiff's imminent termination. Quite the opposite, Timberlake-Cecil apparently voiced concerns about being short-handed and pressed Plaintiff to come to work. Plaintiff invoked her right to FMLA the next day, and her employment with Accredo was over before the week was out. Viewing all of this evidence in the light most favorable to Plaintiff, a reasonable jury could reject Accredo's explanation for the timing of Plaintiff's termination.

In their summary judgment briefs, the parties argue over the thoroughness and reliability of management's investigation into Plaintiff's on-call time. This argument is essentially a battle over "the credibility of the employer's proffered reason."[93] The relevant question there is whether Accredo's conclusions about Plaintiff's on-call time had a basis in fact, one of the possible showings Plaintiff can make to prove pretext. But the Court has already decided that a genuine dispute exists over whether Accredo's proffered reason, i.e. irregularities in Plaintiff's time reporting, actually motivated her termination. With that holding, the Court need not also decide whether the results of Accredo's investigation were well supported factually in order to

---

[93] *Seeger*, 681 F.3d at 285.

rule on Defendants' Motions for Summary Judgment. Therefore, the Court declines to reach the issue of whether management's conclusions about Plaintiff's on-call time had a basis in fact.

Defendants once again rely on the honest belief rule to overcome Plaintiff's proof of pretext. The Sixth Circuit has recently commented that the honest belief rule arguably "responds more logically to the 'had no basis in fact' theory of pretext" than the "did not actually motivate" theory of pretext.[94] The real issue in this case is not whether Accredo had an honest belief in the factual basis supporting Plaintiff's termination, i.e. Plaintiff's alleged falsification of on-call time logs. The question for a jury is whether Plaintiff's alleged falsification of on-call time actually motivated Accredo's decision to discharge her, in light of the timing of Plaintiff's termination and her request for FMLA leave. Was her firing the inevitable result of the investigation and the timing of her discharge a coincidental result of unavoidable delays around the holidays, or was her termination in some part motivated by the fact that Plaintiff had requested FMLA leave? Under these circumstances, Defendants have not shown why the honest belief rule should apply to overcome Plaintiff's inference of pretext. Therefore, Defendants' Motion for Summary Judgment is **DENIED** as to Plaintiff's FMLA retaliation claim.

## IV. Americans with Disabilities Act and Tennessee Disability Act

The ADA prohibits discrimination against "a qualified individual on the basis of disability."[95] Similarly, the Tennessee Disability Act, Tenn. Code Ann. § 8–50–103, prohibits "discrimination in the hiring, firing and other terms and conditions of employment" by "any private employer" on the basis of disability.[96] Claims under the TDA are analyzed under the

---

[94] *Amos v. McNairy Cnty.*, 622 F. App'x 529, 541 n.10 (6th Cir. 2015).

[95] 42 U.S.C. § 12112(a).

[96] Tenn. Code Ann. § 8–50–103.

same principles and standards as those utilized for the ADA.[97]   Under both statutes, a plaintiff alleging disability discrimination must first file an administrative charge of discrimination with the EEOC and exhaust her administrative remedies for the claim.[98]

At summary judgment Accredo argues that Plaintiff failed to exhaust her administrative remedies as to any claim for the failure to accommodate her disability under the ADA.  The exhaustion requirement operates "to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation."[99]   A plaintiff's judicial complaint is therefore "limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination."[100] Here Plaintiff's charge with the EEOC alleges disability discrimination arising out of her termination in January 2014.  Plaintiff argues that her charge gave the EEOC reasonable notice of her claims that Defendants had discriminated against her by wrongfully terminating her employment and also failed to accommodate her disability.

However, "disability discrimination claims and claims alleging failure to accommodate are analytically distinct."[101]   As the Seventh Circuit has observed, the two claims "are not like or

---

[97] *Cardenas–Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (6th Cir. 2013) (citing *Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004)); *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 n.5 (6th Cir. 2008) ( "Both federal and Tennessee disability discrimination actions require the same analysis.") (citation omitted).

[98] 42 U.S.C. § 12117(a).

[99] *Dixon v. Ashcroft,* 392 F.3d 212, 217 (6th Cir. 2004).

[100] *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 379 (6th Cir. 2002) (citation omitted).

[101] *Stone v. Premier Orthopaedics & Sports Medicine, PLC*, No. 3:12-cv-00762, 2015 WL 4487778, at *11 (M.D. Tenn. July 23, 2015).

reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability."[102]   Simply put, "an administrative charge alleging disability discrimination alone does not automatically exhaust administrative remedies for a failure-to-accommodate claim."[103] In this case Plaintiff's charge explicitly states that she was wrongfully terminated because of her disability.  Plaintiff alleges that her termination amounted to discrimination under the ADA.  The charge, however, never alleges in any way a failure to accommodate, either a request for an accommodation from Plaintiff or the denial of an accommodation from Accredo.  The Court concludes then that Plaintiff failed to exhaust her administrative remedies for her failure to accommodate claim.  Therefore, Accredo is entitled to judgment as a matter of law on Plaintiff's failure to accommodate theory.

Turning to the merits of Plaintiff's disability discrimination claim, Plaintiff has the initial burden[104] to establish the following elements of her claim for discriminatory discharge: (1) she is disabled;  (2) she was otherwise qualified for the position, with or without reasonable accommodation;  (3) she suffered an adverse action;  (4) the employer knew or had reason to

---

[102] *Whitaker v. Milwaukee Cnty.,* 772 F.3d 802, 813 (7th Cir. 2014) (quoting *Green v. Nat'l Steel Corp.,* 197 F.3d 894, 898 (7th Cir. 1999)).

[103] *Lara v. Unified Sch. Dist. # 501,* 350 F. App'x 280, 285 (10th Cir. 2009); *see Jones v. Sumser Retirement Vill.,* 209 F.3d 851, 853 (6th Cir. 2000) (stating that a court does not have subject matter jurisdiction over an ADA claim "unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge" and concluding that a reasonable accommodation claim did not arise from plaintiff's wrongful termination claim).

[104] Plaintiff's ADA claim is evaluated under the *McDonnell Douglas* burden-shifting framework. *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1178–85 (6th Cir. 1996) (abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc)).

know of her disability; and (5) she was replaced or the job remained open.[105]  Under the ADA, the plaintiff's disability must be a "but for" cause of the adverse employment action.[106]  In this case, Accredo only contests the fourth element, whether Accredo knew or had reason to know of Plaintiff's disability.  The key inquiry is whether the decisionmaker responsible for Plaintiff's termination was aware of her condition.  "[A]n employee cannot be considered to have been fired 'on the basis of disability' unless the individual decision-maker who fired the individual had knowledge of that disability."[107]  In this case Tammy Timberlake-Cecil made the recommendation to terminate Plaintiff, and Laura Eikerekoetter, the director of human resources, adopted the recommendation and/or communicated the decision to terminate to Plaintiff.  However, Plaintiff has not shown that either of these decision-makers (or any other relevant party) knew about Plaintiff's condition.  As such, Plaintiff's ADA and TDA discrimination claims fail.

At summary judgment, Plaintiff cites evidence that she had told a previous supervisor about her condition, and Plaintiff surmises that her old supervisor may have told Timberlake-Cecil about Plaintiff's lupus.  Plaintiff testified in her deposition that Accredo had a general custom where an outgoing supervisor briefed the incoming supervisor on each employee and certain information about the employee.  But as the Court noted in its analysis of the parties' evidentiary submissions, Plaintiff's testimony is merely speculation.  Nothing in Plaintiff's testimony showed that she had personal knowledge of the supposed custom much less the actual

---

[105] *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 735-36 (6th Cir. 2015) (citing *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012)).

[106] *Demyanovich*, 747 F.3d at 433.

[107] *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015) (citing *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 368 (6th Cir. 2013)); *see also Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) (holding that an employer cannot discriminate "'because of' a disability if it has no knowledge of the disability").

conversation between her former supervisor and Timberlake-Cecil. "The nonmoving party cannot create a genuine dispute of material fact through mere speculation, conjecture, or fantasy."[108] And nothing in the record shows that Eikerenkoetter or any other possible decision-maker knew about Plaintiff's condition. Without such proof Plaintiff cannot establish her prima facie claim of disability discrimination. Therefore, Defendants' Motions for Summary Judgment must be **GRANTED** as to Plaintiff's disability discrimination claims.

## V. Retaliation Under the Fair Labor Standards Act

"The FLSA requires employers to pay at least a specified minimum wage for each hour worked, *see* 29 U.S.C. § 206, and overtime compensation for employment in excess of forty hours in a workweek, 29 U.S.C. § 207(a)(1)."[109] "The Fair Labor Standards Act proscribes retaliation by 'discharg[ing]' or otherwise 'discriminat[ing]' against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act."[110] In order to make out her claim of FLSA retaliation, Plaintiff must prove the following elements: (1) she engaged in a protected activity under the FLSA; (2) her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action.[111] The Supreme Court has commented in dicta that enforcement of

_____

[108] *Thompson I.G., LLC v. Edgetech I.G. Inc.*, 590 F. App'x 532, 537 (6th Cir. 2014) (citing *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

[109] *Chao v. Tradesmen Int'l, Inc.*, 310 F.3d 904, 907 (6th Cir. 2002).

[110] *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 529 (6th Cir. 2011) (quoting 29 U.S.C. § 215(a)(3)).

[111] *Evans v. Prof. Transp., Inc.*, 614 F. App'x 297, 300 (6th Cir. 2015) (quoting *Adair v. Charter Cnty. of Wayne,* 452 F.3d 482, 489 (6th Cir. 2006)).

the FLSA depends "not upon continuing detailed federal supervision or inspection of payrolls, but upon information and complaints received from employees seeking to vindicate rights claimed to have been denied."[112]  The FLSA's "anti-retaliation provision makes this enforcement scheme effective by preventing fear of economic retaliation from inducing workers quietly to accept substandard conditions."[113]

Viewing the undisputed facts at summary judgment in the light most favorable to Plaintiff, Plaintiff has not shown that she engaged in protected activity under the FLSA or that there is any causal connection between a protected activity and her termination.  With respect to protected activity, the FLSA protects only complaints "under or related to this Act."[114]  The Supreme Court has held that a protected complaint can be oral or written but must be "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."[115]  The Sixth Circuit has long held that "it is the assertion of statutory rights" that triggers the FLSA's protection against retaliation.[116]  In this case Plaintiff has shown that she inquired with human resources about overtime pay for on-call hours she worked in August 2013, the same hours management had under review as part of the investigation into Plaintiff's on-call time logs.  However, Plaintiff's follow-up message did not challenge Accredo's practice as a

---

[112] *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11-12 (2011) (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960) (internal quotation marks omitted)).

[113] *Id.* at 12.

[114] 29 U.S.C. § 215(a)(3).

[115] *Kasten*, 563 U.S. at 14.

[116] *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (quoting *E.E.O.C. v. Romeo Cmty. Sch.,* 976 F.2d 985, 989 (6th Cir. 1992).

violation of the FLSA or invoke her statutory rights to overtime in such a way that a reasonable employer would understand her emails to be assertions of a right "under or related to" the FLSA. Plaintiff simply asked about the status of her pay. The Court concludes that this was not enough to constitute an activity protected by the FLSA.

Even if Plaintiff could show that she engaged in protected FLSA activity, Plaintiff has not proven that the relevant decisionmakers knew about her activity or that a causal connection exists between her protected activity and her termination. Plaintiff sent the last email requesting an update on her August 2013 overtime on November 7, 2013. Plaintiff's email was addressed to Jodi Bruhn, a senior human resources manager. It is undisputed that the recommendation to terminate Plaintiff was made by Tammy Timberlake-Cecil and that Laura Eikerenkoetter actually communicated the final termination to Plaintiff on January 10, 2014. By that time Bruhn was no longer employed by Accredo, and Plaintiff herself has asserted that Bruhn was not involved in the decision to terminate Plaintiff's employment.[117] Otherwise, there is no evidence in the record that Timberlake-Cecil or Eikerenkoetter were aware of Plaintiff's November 2013 email to Bruhn. Perhaps more importantly, there is no proof before the Court that Plaintiff's request for the overtime pay was considered in any way as part of the decision to discharge her. Based on the three month span of time between Plaintiff's email to Bruhn and the fact that the relevant decisionmakers were not aware of the email, Plaintiff has not shown a causal connection between her November 2013 email and her January 2014 termination. The Court holds then that Plaintiff has failed to prove a prima facie case of FLSA retaliation. Therefore, Defendants' Motion to for Summary Judgment is **GRANTED** as to Plaintiff's FLSA claim.

## VI. Retaliatory Discharge Under Tennessee Law

---

[117] Pl.'s Statement of Add'l Fact ¶¶ 28, 29.

"Tennessee has long adhered to the employment-at-will doctrine in employment relationships not established or formalized by a contract for a definite term," meaning "both the employer and the employee are generally permitted, with certain exceptions, to terminate the employment relationship at any time for good cause, bad cause, or no cause."[118] Tennessee does recognize a narrow exception to the general rule of at-will employment, a common law claim for retaliatory discharge where an employee's termination violates public policy.[119] To establish a prima facie case of common-law retaliatory discharge, an employee must prove the following elements: "(1) that an employment-at-will relationship existed; (2) that the employee was discharged, (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy."[120]

The Tennessee courts have held that a common law claim for retaliatory discharge may arise in a variety of circumstances. Recently, in *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34 (Tenn. 2015), the Tennessee Supreme Court held that "[o]ne of the factual scenarios that will support a common law cause of action for retaliatory discharge is when an employee is discharged for refusing to remain silent about his employer's illegal activity or unsafe

---

[118] *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d. 852, 857 (Tenn. 2002) (citations omitted); *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 528 (Tenn. Ct. App. 2006) (noting that employment at-will is a "bedrock" of Tennessee law).

[119] *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 556 (Tenn. 1988).

[120] *Cobb v. Keystone Memphis, LLC*, 526 F. App'x 623, 626 (6th Cir. 2013) (quoting *Crews*, 78 S.W.3d at 862).

practices—commonly referred to as a 'whistleblower' claim."[121]  For example, in *Guy v. Mutual of Omaha Insurance Co.*, 79 S.W.3d 528 (Tenn. 2002), the Tennessee Supreme Court recognized a common law "whistleblower" claim where an insurance agent was terminated for reporting the illegal conduct of another agent.  The *Guy* court explained that the plaintiff had not only brought to light a violation of the law but also "asserted a well-defined and established public policy as the basis for his retaliatory discharge claim."[122]  Plaintiff's Amended Complaint specifically alleges that her retaliatory discharge claim falls under *Guy*.

Separate and apart from the common law whistleblower cause of action, the Tennessee Supreme Court has also recognized a distinct category of common law retaliatory discharge where an employee is terminated for exercising a protected right or duty.  For example, in *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441 (Tenn. 1984), the Tennessee Supreme Court held that the Tennessee worker's compensation statute implied a cause of action for retaliatory discharge where an employer terminated its employee for attempting to exercise her right to worker's compensation.  In *Crews v. Buckman Laboratories International, Inc.*, 78 S.W.3d. 852 (Tenn. 2002), the Tennessee Supreme Court recognized a common law retaliatory discharge claim for corporate in-house counsel who was terminated for carrying out a professional duty to report the unauthorized practice of law by the corporation's general counsel.[123]  Nevertheless,

---

[121] *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 37 (Tenn. 2015).

[122] *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 539 (Tenn. 2002).  On July 1, 2014, the Tennessee legislature amended the TPPA and thereby abrogated the common law claim for refusing to participate in illegal activities or for refusing to remain silent about illegal activities.  Tenn. Code Ann. § 50–1–304(g) (2015).  The amendment, however, had no effect on other common law claims for retaliatory discharge.  *Williams v. City of Burns*, 465 S.W.3d 96, 110 n.11 (Tenn. 2015).  Because it appears to be undisputed that Plaintiff's cause of action accrued prior to the effective date of the amended TPPA, the Court will apply pre-amendment case law and proceed to analyze his refusal to remain silent claim under both the common law and the TPPA.

"[t]he Tennessee Supreme Court has stressed that the exception to the employment-at-will doctrine represented by this cause of action must be narrowly applied and not be permitted to consume the general rule that employers need freedom to make their own business judgments without interference from the courts."[124] Plaintiff's claims could also be construed as "exercise of right or duty" retaliation claims.

In addition to the common law tort, the TPPA provides "statutory protection to employees whose actions served to deter, expose, and stop organizational wrongdoing."[125] The TPPA, also known as the "Whistleblower Act," provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities."[126] To establish a claim for retaliatory discharge under the TPPA, a plaintiff must prove: (1) his status as an employee of the defendant; (2) his refusal to participate in, or remain silent about, illegal activities; (3) his termination; and (4) an exclusive causal relationship between the refusal to participate in, or remain silent about, illegal activities and his termination.[127] The TPPA defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare."[128]

---

[123] *Crews*, 78 S.W.3d at 866.

[124] *Hugo v. Millennium Labs., Inc.*, 590 F. App'x 541, 544 (6th Cir. 2014) (quoting *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 & n.3 (Tenn. 1997)) (internal punctuation omitted).

[125] *Williams*, 465 S.W.3d at 109-110.

[126] Tenn. Code Ann. § 50–1–304(b).

[127] *Amos v. McNairy Cnty.*, 622 F. App'x at 536 (citing *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 437 (Tenn. 2011) (other citations omitted).

[128] Tenn. Code Ann. § 50–1–304(a)(3).

Defendants seek summary judgment on Plaintiff's claims for retaliatory discharge, both under a common law theory as well as under the TPPA. Defendants argue as a threshold question that both the FMLA and the FLSA preempt any claim under Tennessee law based on a violation of the protections afforded by the federal statutes. Both parties acknowledge that the Sixth Circuit has not specifically addressed these issues. The "ultimate touchstone" in any preemption case is "the purpose of Congress."[129] Preemption is more likely when Congress legislates "in an area where there has been a history of significant federal presence."[130] But "[w]hen Congress legislates in a field that the States have traditionally occupied, courts start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[131] After all, the individual States exist as "independent sovereigns in our federal system."[132] Therefore, "the mere existence of a federal regulatory or enforcement scheme does not by itself imply preemption of state remedies."[133]

Preemption works in three ways: "First, a federal statute may expressly preempt the state law. Second, a federal law may impliedly preempt state law. Third, preemption results from an actual conflict between a federal and a state law."[134] This case presents an example of conflict

---

[129] *Wimbush v. Wyeth,* 619 F.3d 632, 642 (6th Cir. 2010) (quoting *Demahy v. Actavis, Inc.*, 593 F.3d 428, 433–34 (5th Cir. 2010)).

[130] *R.R. Ventures, Inc. v. Surface Transp. Bd.,* 299 F.3d 523, 562 (6th Cir. 2002) (quoting *United States v. Locke,* 529 U.S. 89, 108 (2000)).

[131] *Id.* (quoting *Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 1194–95 (2009)).

[132] *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996).

[133] *English v. Gen. Elec. Co.,* 496 U.S. 72, 87 (1990).

[134] *Garcia v. Wyeth–Ayerst Labs.,* 385 F.3d 961, 965 (6th Cir. 2004).

preemption. Conflict preemption occurs when a provision of federal law "actually conflicts with state law."[135] An actual conflict arises when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[136] A number of federal courts have held that the FMLA preempts state whistleblower and retaliatory discharge statutes.[137] Most notably, the United States District Court for the Middle District of Tennessee has concluded that the FMLA preempts retaliatory discharge claims under Tennessee common law and the TPPA, in large part because the remedies provided under the FMLA are narrower and therefore conflict with the broader remedies provided under Tennessee law.[138] The Court finds the reasoning of these decisions apposite and persuasive. Therefore, the Court holds that Plaintiff's FMLA claims preempt her claims under the TPPA or Tennessee common law.

The federal courts are more sharply divided on the question of the FLSA's preemptive effect on state whistleblower and retaliatory discharge laws. Some have concluded that the FLSA preempts all other state law claims;[139] others have reached the opposite conclusion.[140]

---

[135] *Fednav, Ltd. v. Chester*, 547 F.3d 607, 619 (6th Cir. 2008).

[136] *See Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 721 (1985).

[137] *McAllister v. Quality Mobile X-Ray Servs., Inc.*, No. 3:12-cv-0078, 2012 WL 3042972, at *6 (M.D.Tenn. July 25, 2012) (collecting cases).

[138] *Id.* ("However, if the plaintiff was allowed to bring a retaliatory discharge claim premised on a violation of the FMLA and prevailed, she could potentially circumvent the exclusive set of remedies Congress created by recovering damages that the statute does not otherwise permit.").

[139] *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir. 2007) ("Because the FLSA's enforcement scheme is an exclusive one, we further conclude that the Class Members' FLSA-based contract, negligence, and fraud claims are precluded under a theory of obstacle preemption."); *Roman v. Maietta Const., Inc.,* 147 F.3d 71, 76 (1st Cir. 1998) ("[T]he plaintiff cannot circumvent the exclusive remedy prescribed by Congress by asserting equivalent state claims in addition to the FLSA claim.").

The Court finds it unnecessary to reach the preemption issue as it pertains to the FLSA. Plaintiff has failed to adduce evidence to prove either a common law claim of retaliation or a TPPA claim based on any violation of the FLSA. Plaintiff's Tennessee common law claim fails because she has not shown that she was discharged for attempting to exercise her rights under the FLSA or that her exercise of her protected rights was a substantial factor in her termination. Just as Plaintiff could not show that she engaged in a protected activity under the FLSA, Plaintiff has not proven that she was discharged for attempting to exercise her rights under the FLSA. Without some proof that she attempted to exercise her FSLA rights, Plaintiff cannot show that such an exercise was a factor in her termination, much less a substantial factor. As a result, Plaintiff's common law retaliatory discharge claim fails on the merits.

Likewise, Plaintiff has failed to establish her TPPA claim based on her FLSA rights to overtime. Plaintiff has not shown that she refused to remain silent about any illegal activities or that an exclusive causal relationship exists between her refusal to remain silent about illegal activities and her termination. Plaintiff's protected activity consists of simply sending an email to Accredo's senior human resources manager in which Plaintiff inquired about the status of overtime pay she believed was owed. For the reasons highlighted in the Court's discussion of Plaintiff's FLSA claim, nothing about Plaintiff's internal communication amounted to

---

[140] *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 263 (3d Cir. 2012) ("We cannot conclude that plaintiffs are doing an 'end run' around the requirements of the FLSA simply because state legislatures made the policy decision to track federal standards in enacting their own labor laws."); *Shahriar v. Smith & Wollensky Restaurant Grp., Inc.*, 659 F.3d 234, 248 (2d Cir. 2011) ("We have held that [the FLSA's savings] clause demonstrates Congress' intent to allow state wage laws to co-exist with the FLSA by permitting explicitly, for example, states to mandate greater overtime benefits than the FLSA."); *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 760 (9th Cir. 2010), vacated on other grounds *Chinese Daily News, Inc. v. Wang*, 132 S. Ct. 74 (2011) ("We therefore hold that FLSA does not preempt a [California] state-law [] claim that 'borrows' its substantive standard from FLSA.").

whistleblowing, which would promote the public interest, as opposed to Plaintiff's merely "private or proprietary" interests.[141]  And without proof of engaging in an activity protected under the TPPA, Plaintiff cannot show that her activity was the exclusive reason for her termination.  Therefore, Defendants' Motions for Summary Judgment are **GRANTED** as to Plaintiff's common law retaliatory discharge and TPPA claims.

## CONCLUSION

The Court holds that Plaintiff has not shown that Defendant Express Scripts Administrators, LLC was her joint employer.  Therefore, Defendant Express Scripts Administrators, LLC's Motion for Summary Judgment is **GRANTED**.  Furthermore, Plaintiff has failed to make out her claims for disability discrimination under the ADA and TDA, her claim for retaliation in violation of the FLSA, or her retaliatory discharge claims under Tennessee common law or the TPPA.  Genuine issues of material fact remain as to Plaintiff's claims of interference and retaliation under the FMLA.  Therefore, Accredo's Motion for Summary Judgment is **GRANTED in part, DENIED in part**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  June 20, 2016.

---

[141] *Haynes*, 463 S.W.3d at 40 (quoting Guy, 79 S.W.3d at 537 n.4).